UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,       ) | |
|                           ) | |
|           Plaintiff,     ) | VERIFIED COMPLAINT |

UNITED STATES OF AMERICA,

          Plaintiff,

      - v.-

ALL FUNDS HELD IN ACCOUNT NUMBER
CH1408760000050335300 AT LOMBARD
ODIER DARIER HENTSCH & CIE BANK,
SWITZERLAND, ON BEHALF OF TAKILANT
LIMITED, AND ANY PROPERTY
TRACEABLE THERETO,

ALL FUNDS UP TO AN AMOUNT TOTALING
$198,919,748.00 HELD IN ACCOUNT
NUMBER CH3408760000050982900 AT
LOMBARD ODIER DARIER HENTSCH & CIE
BANK, SWITZERLAND, ON BEHALF OF
TOZIAN LIMITED, AND ANY PROPERTY
TRACEABLE THERETO, and

ALL FUNDS UP TO AN AMOUNT TOTALING
$3,500,000.00 HELD IN ACCOUNT
NUMBER CH2308657007007159821 AT
UNION BANCAIRE PRIVEE,
SWITZERLAND, ON BEHALF OF TOZIAN
LIMITED, AND ANY PROPERTY
TRACEABLE THERETO.

      Defendants-in-rem.

**VERIFIED COMPLAINT**

16 Civ.

      Comes now the Plaintiff, the United States of America,
through its undersigned attorneys, and alleges, upon information
and belief, as follows:

**NATURE OF THE ACTION**

1.    This is an action *in rem* to forfeit more than $550
million in assets, and any property traceable thereto, involved
in an international conspiracy to launder corrupt payments made
to GOVERNMENT OFFICIAL A, a close relative of a high-ranking
Uzbek government official, and a government official at all
times relevant to the facts alleged.  This action seeks
forfeiture of property located in Switzerland that was derived
from violations of U.S. law pursuant to 18 U.S.C. §
981(a)(1)(C), and property involved in a money laundering
offense in violation of 18 U.S.C. §§ 1956 and 1957 pursuant to
18 U.S.C. § 981(a)(1)(A).

2.    Upon information and belief, and as alleged herein,
from in or about 2004 through in or around 2012, three
international telecommunications companies, MOBILE TELESYSTEMS
OJSC (MTS), VIMPELCOM LTD ("VIMPELCOM")[1], and TELIASONERA AB
("TELIASONERA") (collectively, the "TELECOM COMPANIES"), made
more than $800 million in corrupt payments to shell companies
beneficially owned by GOVERNMENT OFFICIAL A.[2]  The TELECOM
COMPANIES made these payments in exchange for, among other
things, inducing GOVERNMENT OFFICIAL A to use his/her influence

---

[1]   As referred to in this Verified Complaint, VIMPELCOM refers
to both OJSC VIMPEL-COMMUNICATIONS and VIMPELCOM LTD.
[2]       Unless otherwise indicated, all amounts referenced in
dollars ($) are denominated in U.S. dollars.

2

in the government of Uzbekistan and instrumentalities thereof to affect or influence acts and decisions of Uzbek government officials or instrumentalities in order to assist the TELECOM COMPANIES in entering and operating in the Uzbek telecommunications market, including by influencing government officials at the Uzbek Agency for Communications and Information ("UzACI").

3. Upon information and belief, these TELECOM COMPANIES collectively used three types of transactions to conceal corrupt payments to GOVERNMENT OFFICIAL A. First, shell companies beneficially owned by GOVERNMENT OFFICIAL A obtained or retained equity interests in the TELECOM COMPANIES' Uzbek subsidiaries, and later sold or resold these interests to the TELECOM COMPANIES for an excessive profit. Second, GOVERNMENT OFFICIAL A's shell company entered into a series of contracts with the TELECOM COMPANIES or their subsidiaries, for the purpose of accepting millions of dollars in corrupt payments. In exchange for these corrupt payments, GOVERNMENT OFFICIAL A's shell company arranged to have its subsidiary waive rights to use certain valuable assets, agreeing that GOVERNMENT OFFICIAL A's shell company would not receive full payment from the TELECOM COMPANIES until these assets were reassigned to the TELECOM COMPANIES' Uzbek subsidiaries by an Uzbek government agency using a non-transparent, non-competitive process. Third, a

3

shell company beneficially owned by GOVERNMENT OFFICIAL A entered into multi-million dollar consulting contracts with two of the TELECOM COMPANIES, VIMPELCOM and TELIASONERA, for the purpose of structuring large corrupt payments to GOVERNMENT OFFICIAL A to corruptly induce him/her to use his/her influence with the Uzbek government to assist the TELECOM COMPANIES' operations in Uzbekistan.

4.     Upon information and belief, a group of shell companies, including TAKILANT LIMITED ("TAKILANT"), SWISDORN LIMITED ("SWISDORN"), and EXPOLINE LIMITED ("EXPOLINE"), beneficially owned by GOVERNMENT OFFICIAL A, were used to carry out and conceal his/her involvement in this series of corrupt contracts and payments to mask the true sources of his/her wealth.  The corruption proceeds were laundered through a complex series of monetary transactions, including through bank accounts in Switzerland and the transfer of funds into and out of correspondent banking accounts at financial institutions in the United States.

### THE DEFENDANTS *IN REM*

5.     This is an action by the United States of America seeking forfeiture of all right, title and interest in the following property (collectively, the "Defendant Properties"):

a. All funds held in account number CH140876000005 0335300 at Lombard Odier Darier Hentsch & Cie Bank, Switzerland, on behalf of Takilant Limited, and any property traceable thereto ("TAKILANT's LOMBARD ODIER ACCOUNT"),

b. All Funds up to an amount totaling $198,919,748.00 held in account number CH3408760000050982900 at Lombard Odier Darier Hentsch & Cie Bank, Switzerland, on behalf of Tozian Limited, and any property traceable thereto ("TOZIAN's LOMBARD ODIER ACCOUNT"), and

c. All Funds up to an amount totaling $3,500,000.00 held in account number CH2308657007007159821 at Union Bancaire Privee, Switzerland, on behalf of Tozian Limited, and any property traceable thereto ("TOZIAN's UBP ACCOUNT").

## STATUTORY BASIS FOR FORFEITURE

6. The Defendant Properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because they constitute, or are derived from, proceeds traceable to a violation of an offense constituting a "specified unlawful activity" or a conspiracy to commit such an offense. Specified unlawful activity is defined in 18 U.S.C. § 1956(c)(7) and includes any

5

felony violation of the Foreign Corrupt Practices Act of 1977 ("FCPA"), 15 U.S.C. §§ 78dd-1 *et seq.*

7.     The Defendant Properties are also subject to forfeiture under 18 U.S.C. § 981(a)(1)(A), because they constitute property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957, or are property traceable to such assets.  Section 1957 prohibits the conducting of a monetary transaction with property valued at over $10,000 that is known to be criminally derived and which constitutes the proceeds of "specified unlawful activity," including FCPA violations.  *See* 18 U.S.C. §§ 1956(c)(7)(D) and 1957.

8.     Additionally, the Defendant Properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because they constitute properties involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(1)(B), or are properties traceable to such assets.  Section 1956(a)(1)(B) prohibits the conducting of a financial transaction with property known to be the proceeds of unlawful activity with the intent to conceal the nature, location, source, ownership, or control of proceeds of a specified unlawful activity, including any felony violation of the FCPA.  *See* 18 U.S.C. §§ 1956(a)(1)(B) and 1956(c)(7)(D).

9.     The offenses listed above are described in Attachment A.

10.   As described below, the following entities, among others, were used to execute these financial transactions, and each constitutes a "financial institution," as defined under 31 U.S.C. § 5312(a)(2) for purposes of 18 U.S.C. §§ 1956 and 1957:

a.   Citibank N.A., New York;

b.   Deutsche Bank, New York;

c.   J.P. Morgan Chase & Co., New York;

d.   Standard Chartered Bank, New York; and

e.   Wells Fargo Bank N.A., New York.

## JURISDICTION AND VENUE

11.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1355(a).

12.   Venue is proper in this District pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to forfeiture took place in the Southern District of New York.

13.   This action *in rem* for forfeiture is governed by 18 U.S.C. §§ 981 and 983, the Federal Rules of Civil Procedure, and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

## RELEVANT NAMES AND ENTITIES

14.   GOVERNMENT OFFICIAL A is a close relative of a high-ranking Uzbek government official.  Throughout the relevant time

7

period, from at least 2005 until July 2013, GOVERNMENT OFFICIAL A also held several positions in the Uzbek government.

15.   MTS is a multinational telecommunications company headquartered and incorporated in Russia.  During the period of in or around 2000 to the present, MTS maintained a class of publicly traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78l, and was required to file periodic reports with the SEC under Section 15(d) of the Securities Exchange Act, 15 U.S.C. § 78o(d). Accordingly, MTS is an "issuer," as that term is defined in the FCPA.

16.   Uzdunrobita LLC ("Uzdunrobita") is MTS's Uzbek subsidiary.  MTS conducted its Uzbek mobile telecommunications business through Uzdunrobita, from August 2004 until its operations were suspended on July 17, 2012 by UzACI.

17.   VIMPELCOM is currently headquartered in Amsterdam, the Netherlands, and is incorporated in Bermuda.  Before 2010, VIMPELCOM was headquartered and incorporated in Russia as OJSC VIMPEL-COMMUNICATIONS.  In or around 1996 to the present, VIMPELCOM maintained a class of publicly traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78l, and was required to file periodic reports with the SEC under Section 15(d) of the Securities

Exchange Act, 15 U.S.C. § 78o(d). Accordingly, VIMPELCOM is an issuer, as that term is defined in the FCPA.

18.   Unitel LLC ("Unitel") is VIMPELCOM's Uzbek subsidiary. Starting in July 2006, VIMPELCOM conducted its Uzbek mobile telecommunications business through Unitel.

19.   Bakarie Uzbekistan Telecom LLC ("Buztel") was an Uzbek telecom company. VIMPELCOM acquired Buztel on or about January 18, 2006.

20.   TELIASONERA is headquartered and incorporated in Sweden. Starting in or around 2002, TELIASONERA maintained a class of publicly traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78l, and was required to file periodic reports with the SEC under Section 15(d) of the Securities Exchange Act, 15 U.S.C. § 78o(d). Accordingly, TELIASONERA is an issuer, as that term is defined in the FCPA. TELIASONERA submitted an SEC Form 15F, certification and notice of termination of registration to the SEC, which was received on June 7, 2007.

21.   OOO Coscom ("Coscom") is TELIASONERA's Uzbek subsidiary. TELIASONERA conducts its Uzbek telecommunications business through Coscom starting in or around July 2007.

22.   During the relevant time period, UzACI was an Uzbek governmental entity authorized to regulate operations and

formulate state policy in the sphere of communication, information, and the use of radio spectrum in Uzbekistan.

23.    GAYANE AVAKYAN ("AVAKYAN") was GOVERNMENT OFFICIAL A's close associate, and was twenty years old when TAKILANT was incorporated in 2004 and had no significant experience in the telecommunications industry.  AVAKYAN served as the sole director and sole shareholder of TAKILANT during the relevant time period.  According to media reports, in or around February 2014, AVAKYAN was arrested in GOVERNMENT OFFICIAL A's apartment by the Uzbek police and charged with forgery, illegal business activities, money laundering, tax evasion, and illegal export of hard currency in large amounts.  According to media reports, AVAKYAN was subsequently convicted and sentenced to six years in Uzbek jail.

24.    RUSTAM MADUMAROV ("MADUMAROV") was GOVERNMENT OFFICIAL A's associate and, at times, his/her boyfriend.  MADUMAROV held various roles in connection with SWISDORN and EXPOLINE, as set forth below.  According to media reports, in or around February 2014, MADUMAROV was arrested in GOVERNMENT OFFICIAL A's apartment by the Uzbek police and charged with forgery, illegal business activities, money laundering, tax evasion, and illegal export of hard currency in large amounts.  According to media reports, MADUMAROV was subsequently convicted and sentenced to six and a half years in Uzbek jail.

25.   BEKHZOD AKHMEDOV ("AKHMEDOV") was GOVERNMENT OFFICIAL A's associate and telecommunications representative, who also headed MTS' Uzbek subsidiary, Uzdunrobita.

### GOVERNMENT OFFICIAL A's SHELL COMPANIES

26.   Upon information and belief, three shell companies beneficially owned by GOVERNMENT OFFICIAL A, TAKILANT, SWISDORN, and EXPOLINE, were used to accept or launder payments made by the TELECOM COMPANIES.

   a.   TAKILANT was incorporated in Gibraltar by Form-A-Co. (Gibraltar) Ltd. ("Form-A-Co."), a corporate formation agency.   AVAKYAN was TAKILANT's sole shareholder and director and had signatory authority for accounts held by TAKILANT.

   b.   SWISDORN was also incorporated in Gibraltar by Form-A-Co.   MADUMAROV was SWISDORN's sole shareholder and director and had signatory authority for accounts held by SWISDORN.   AKHMEDOV held power of attorney to conduct company and banking business for SWISDORN.

   c.   EXPOLINE was incorporated in Hong Kong.   MADUMAROV was EXPOLINE's sole shareholder and director and had signatory authority for accounts held by EXPOLINE.

27.   GOVERNMENT OFFICIAL A was the beneficial owner of TAKILANT, SWISDORN, and EXPOLINE.

## GOVERNMENT OFFICIAL A'S INFLUENCE IN THE UZBEK TELECOM MARKET

28.    During all relevant time periods, GOVERNMENT OFFICIAL A exerted influence in, and over Uzbek government officials overseeing, Uzbekistan's telecommunications market.  In exchange for payments or valuable equity interests, GOVERNMENT OFFICIAL A corruptly assisted companies entering and operating in the Uzbek market.  His/her influence in, and over Uzbek government officials who oversaw, the Uzbek telecom sector is evidenced by the following conduct, among others:

a.    First, executives at the TELECOM COMPANIES understood that they were required to enter into lucrative contracts with GOVERNMENT OFFICIAL A's shell companies in order to enter the Uzbek telecommunications market.

1. As described herein, MTS entered the Uzbek telecommunications market after purchasing an equity interest in Uzdunrobita from SWISDORN, a shell company beneficially owned by GOVERNMENT OFFICIAL A.  Although MTS purchased an ownership interest in Uzdunrobita from both SWISDORN and a U.S. company, MTS paid a premium to SWISDORN, exceeding the amount it paid the U.S. company, to acquire a portion of SWISDORN's ownership interest.

12

2. Additionally, as described herein, VIMPELCOM entered the Uzbek telecommunications market after purchasing two Uzbek telecommunications companies, Buztel and Unitel.  Upon information and belief, TAKILANT, a shell company beneficially owned by GOVERNMENT OFFICIAL A, held an ownership interest, or an option to acquire an ownership interest, in Buztel.  Upon information and belief, at the time of the acquisition, GOVERNMENT OFFICIAL A was able to corruptly influence which entity would be permitted to purchase Unitel.

3. As described herein, an UzACI official turned off Coscom's telecommunications network after Coscom agreed to sell its business to a Qatari company.  TELIASONERA was only able to purchase Coscom after it agreed to enter into a lucrative agreement with TAKILANT, GOVERNMENT OFFICIAL A's shell company.

b.  Executives at the TELECOM COMPANIES also understood that they were required to make these corrupt payments in order to obtain radio frequencies and other assets from UzACI beneficial for operating in the Uzbek market.

1. The TELECOM COMPANIES made corrupt payments
   to shell companies beneficially owned by
   GOVERNMENT OFFICIAL A in order to obtain
   these frequencies and other assets.

2. After making these payments the TELECOM
   COMPANIES in fact obtained these assets from
   UzACI.

3. As a result, the TELECOM COMPANIES dominated
   the Uzbek telecommunications market.  From
   2008 until 2011, MTS, VIMPELCOM, and
   TELIASONERA were the three largest providers
   in the Uzbek mobile telecommunications
   market.

## MTS'S ACTIVITIES IN UZBEKISTAN

**A. MTS Made Corrupt Payments to SWISDORN to Gain Access to the Uzbek Telecommunications Market**

29.   MTS entered the Uzbek telecommunications market in 2004 by paying $100 million to SWISDORN, a shell company beneficially owned by GOVERNMENT OFFICIAL A, to purchase a portion of its shares in an Uzbek telecom operator, Uzdunrobita. At the time of MTS's acquisition, a U.S. telecommunications company ("U.S. Company-1") held 41 percent of Uzdunrobita, and SWISDORN owned the remaining 59 percent.

14

30.   In or around 2004, GOVERNMENT OFFICIAL A was listed in the minutes of a General Shareholder Meeting for Uzdunrobita as a representative of SWISDORN.  In or around 2004, GOVERNMENT OFFICIAL A also served as the Chairman of a General Shareholders Meeting for Uzdunrobita when the sale of an equity interest in Uzdunrobita to MTS was approved.

31.   MTS's acquisition of Uzdunrobita was structured in the following manner: MTS purchased 33 percent of Uzdunrobita from SWISDORN for $100 million and acquired an additional 41 percent of Uzdunrobita from U.S. Company-1 for $21 million.  As a result, SWISDORN was paid approximately $3,030,303.03 per percentage interest acquired while U.S. Company-1 was only paid approximately $512,195.12 for each percentage of its interest sold to MTS.

32.   Upon information and belief, MTS paid this premium, constituting the difference in the percentage share value between what MTS paid to U.S. Company-1 and to SWISDORN, for the corrupt purpose of obtaining GOVERNMENT OFFICIAL A's influence, including his/her ability to influence other Uzbek government officials, to assist MTS in entering and operating in the Uzbekistan telecommunications market.

**B.  MTS Purchased SWISDORN's Remaining Interest in Uzdunrobita
      After Paying a Significant Premium to Secure GOVERNMENT
      OFFICIAL A's Influence**

33.   In or around June 2007, through the exercise of a "Put

and Call Option Agreement" with SWISDORN, MTS paid SWISDORN $250

million to acquire SWISDORN's remaining 26 percent interest in

Uzdunrobita.  The letter informing MTS that SWISDORN sought to

exercise its option to sell its interest in Uzdunrobita pursuant

to the Agreement was signed by MADUMAROV.

34.   This $250 million purchase price was more than six

times the price specified in the original "Put and Call Option

Agreement" executed by SWISDORN and MTS in 2004.  The original

2004 Agreement provided that MTS could acquire SWISDORN's

remaining 26 percent interest in Uzdunrobita for $37.7 million

plus five percent interest per annum for each year after the

signing of the Agreement until the option is exercised.

35.   This price was paid after SWISDORN and MTS executed an

addendum to the "Put and Call Option Agreement," dated on or

about June 26, 2007.  The addendum, which was executed at the

insistence of SWISDORN, provided that MTS would purchase

SWISDORN's 26 percent ownership interest in Uzdunrobita for $250

million.

36.   Upon information and belief, MTS paid $250 million to

SWISDORN for the corrupt purpose of obtaining GOVERNMENT

OFFICIAL A's influence, including his/her ability to influence

other Uzbek government officials, to assist MTS in entering and operating in the Uzbekistan telecommunications market.

## C. MTS Also Made Corrupt Payments to TAKILANT in Order to Assist its Operations in the Uzbek Telecommunications Market

37.    After MTS began operating in the Uzbek telecommunications market, MTS sought the assistance of GOVERNMENT OFFICIAL A and his/her associates to operate in the Uzbek telecom sector.

38.    For example, in or around 2008, MTS received periodic complaints from Uzbek regulatory agencies, including UzACI, related to the quality of communication and other problems with Uzdunrobita's operations.  In order to resolve these complaints, MTS representatives sought the assistance of GOVERNMENT OFFICIAL A and his/her associates because their connections to the Uzbek authorities were critical to the company.

39.    Once Uzdunrobita began operating in the Uzbek telecommunications market, Uzdunrobita also entered into a contract with GOVERNMENT OFFICIAL A's shell company, TAKILANT, agreeing to pay TAKILANT $30 million if UzACI granted Uzdunrobita rights to use certain frequencies beneficial to the company for operating in the Uzbek telecom sector.

40.    Specifically, on or about August 21, 2008, MTS agreed to pay TAKILANT $30 million if TAKILANT's Uzbek subsidiary, TELESON MOBILE LLC ("TELESON"), waived its rights to use certain

frequencies.  As part of the agreement, TELESON agreed to send a formal waiver to UzACI "irrevocably repudiate[ing] all rights and interests . . . in and to [certain listed] frequency channels."  The contract provided that TAKILANT was only entitled to full payment if UzACI agreed to reassign the waived frequencies to MTS's subsidiary, Uzdunrobita.

41.    On or about August 25, 2008, Uzdunrobita's license was amended by UzACI, granting it rights to use the frequencies previously owned by TELESON.  The order reassigning the frequencies owned by TELESON to Uzdunrobita was signed by a government official at UzACI.

42.    Upon information and belief, MTS paid $30 million to TAKILANT for the corrupt purpose of obtaining GOVERNMENT OFFICIAL A's influence, including his/her ability to influence other Uzbek government officials and instrumentalities, to assist MTS in operating in the Uzbekistan telecommunications market and in obtaining frequencies, based on the following facts and circumstances, among others:

a.    TELESON was first registered as a legal entity on September 10, 2007, and, upon information and belief, never operated as a mobile telephone service provider prior to waiving its rights to use these frequencies.

b.   TELESON acquired the frequencies that it had agreed to
     repudiate from UzACI on August 14, 2008, only seven
     days before the contract with MTS was executed.

c.   Upon information and belief, the transfer of the
     frequency rights in this manner was designed to
     circumvent Uzbek law prohibiting the direct transfer
     of frequencies, was non-transparent, and avoided a
     competitive bidding process.

d.   Under Uzbek law, telecommunications companies could
     obtain frequencies from the Uzbek government without
     paying upfront fees.  Thus, no part of the $30 million
     paid to TAKILANT was legally required to obtain rights
     to use the frequencies in Uzbekistan.

e.   The frequencies obtained by Uzdunrobita were the same
     frequencies that Uzdunrobita had relinquished one year
     earlier.

**D. Details of Corrupt Payments Made by MTS to SWISDORN and
TAKILANT**

43.   The following corrupt payments, described in the
preceding sections, were made by or on behalf of MTS to SWISDORN
and TAKILANT.  At least four of these payments, including over
$360 million originating from ING Bank (United Kingdom) and
Moscow Bank for Reconstruction and Development (Russia), were
executed through transactions into and out of correspondent bank

19

accounts at financial institutions in New York, New York,
including through Deutsche Bank, J.P. Morgan Chase, and Standard
Chartered Bank.[3]

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| August 9, 2004 | MTS / SWISDORN Escrow | ING Bank, UK | SWISDORN | Aizkraukles, Latvia | $100,033,000 |
| June 28, 2007 | MTS | Moscow Bank for Reconstruction and Development, Russia | SWISDORN | Standard Chartered, Hong Kong | $250,000,000 |
| October 21, 2008 | MTS | Moscow Bank for Reconstruction and Development, Russia | TAKILANT | Parex, Latvia | $5,000,000 |
| February 6, 2009 | MTS Bermuda (an MTS Subsidiary) | ING Bank, Netherlands | TAKILANT | Standard Chartered, Hong Kong | $5,000,000 |
| March 4, 2009 | MTS Bermuda (an MTS Subsidiary) | ING Bank, Netherlands | TAKILANT | Standard Chartered, Hong Kong | $5,000,000 |
| April 28, 2009 | MTS Bermuda (an MTS Subsidiary) | ING Bank, Netherlands | TAKILANT | Standard Chartered, Hong Kong | $5,000,000 |
| June 17, 2009 | MTS Bermuda (an MTS Subsidiary) | ING Bank, Netherlands | TAKILANT | Standard Chartered, Hong Kong | $5,000,000 |
| July 14, 2009 | MTS | Moscow Bank for Reconstruction and Development, Russia | TAKILANT | Standard Chartered, Hong Kong | $5,000,000 |
| | | | | **TOTAL** | $380,033,000 |

---

[3] Accounts held by SWISDORN and TAKILANT, relevant to this Verified Complaint, are listed in Attachment B.

## VIMPELCOM'S ACTIVITIES IN UZBEKISTAN

**A. VIMPELCOM Made Corrupt Payments to TAKILANT to Gain Access and Business Advantages in the Uzbek Telecommunications Market**

44.  In or around 2006, VIMPELCOM corruptly gained access to, and business advantages in, the Uzbek telecommunications market in the following manner:

a.  VIMPELCOM purchased Buztel, a company associated with GOVERNMENT OFFICIAL A, for $60 million.  Financial records show that at least $19 million of the total purchase price was ultimately transferred to TAKILANT.

b.  Following the purchase of Buztel, VIMPELCOM purchased Unitel, another Uzbek telecom company, in or around February 2006.

c.  After merging Unitel and Buztel, VIMPELCOM sold TAKILANT, GOVERNMENT OFFICIAL A's shell entity, a seven percent indirect ownership interest in the merged entity. In the same agreement, VIMPELCOM simultaneously agreed to repurchase that interest on terms that guaranteed that TAKILANT would almost triple its investment in less than three years.

45.  Specifically, VIMPELCOM acquired Buztel on or about January 18, 2006, by paying $60 million and assuming approximately $2.4 million in Buztel debt.  At the time of this acquisition, Buztel served approximately 2,700 subscribers,

representing about a 0.3% market share in Uzbekistan's telecom market.

46.     Upon information and belief, at the time of VIMPELCOM's acquisition of Buztel, TAKILANT also held an ownership interest, or an option to acquire an ownership interest, in Buztel.  Upon information and belief, certain members of VIMPELCOM management knew that GOVERNMENT OFFICIAL A held an ownership interest in Buztel, and also knew that any purchase of Buztel would ultimately involve a monetary payment to GOVERNMENT OFFICIAL A through TAKILANT, further ensuring that GOVERNMENT OFFICIAL A would support VIMPELCOM's entry into the Uzbek telecommunications market.

47.     Upon information and belief, at the time of the Buztel acquisition, GOVERNMENT OFFICIAL A was able to corruptly influence which entity would be permitted to purchase Unitel, then the second largest telecommunications operator in Uzbekistan with over 350,000 subscribers and a 31% telecom market share.  VIMPELCOM management understood, as documented in its corporate minutes, that "due to certain political reasons," Buztel could be considered as "an entry ticket" into the Uzbek telecommunications market and that "the buyer of Buztel would be considered a preferred buyer of Unitel."  Additionally, VIMPELCOM management understood, as documented in corporate minutes, that purchasing Unitel without also purchasing Buztel

would put VIMPELCOM "in opposition to a very powerful opponent"
in Uzbekistan and "bring threat of revocation of licenses."

48. During a December 14, 2005 VIMPELCOM board meeting,
certain VIMPELCOM management explained that GOVERNMENT OFFICIAL
A was actively influencing and interfering with Buztel's
operations because of GOVERNMENT OFFICIAL A's ownership interest
in the company. VIMPELCOM management added that GOVERNMENT
OFFICIAL A appeared to have control and influence over the
purchase price for Unitel. VIMPELCOM management also warned
that if VIMPELCOM only purchased Unitel that would make it
difficult, if not impossible, to operate in Uzbekistan.

49. On or about January 17, 2006, in conjunction with its
acquisition of Buztel, VIMPELCOM transferred $60 million to an
account held by the seller, AQUTE HOLDINGS AND INVESTMENT
("AQUTE"), at Amsterdam Trade Bank. Three days later, on or
about January 20, 2006, $19 million of these funds were
transferred from AQUTE to TAKILANT's Aizkraukles Account,
purportedly as a "PAYMENT FOR CONSULTING SERVICES."

50. On or about February 9, 2006, less than one month
after purchasing Buztel, VIMPELCOM also purchased Unitel for
$200 million, plus the assumption of $7.7 million in debt.

51. In or around April 2006, at a VIMPELCOM board meeting,
VIMPELCOM representatives discussed a proposed partnership with
TAKILANT. Pursuant to this partnership, VIMPELCOM

representatives understood that TAKILANT would provide assistance with, among other things, the merger of Buztel and Unitel, as well as the re-issuance of the licenses, frequencies and permits held by these entities to the merged entity.

52. Specifically, according to an executive summary prepared for the VIMPELCOM Board of Directors and dated April 7, 2006, describing the partnership, the "direct transfer of frequencies between legal entities" was not allowed as a general rule in Uzbekistan. However, VIMPELCOM expected that, prior to the merger of Buztel and Unitel, TAKILANT would help VIMPELCOM obtain a letter from the Uzbek regulator, in which the regulator would accept the merger structure and consent to re-issue all frequencies to the merged entity.

53. In or around July 2006, VIMPELCOM merged Buztel into Unitel, and conducted its Uzbek mobile telecommunications business through the merged entity, Unitel. After the purchase and merger of Buztel and Unitel, all of the frequencies previously held by Buztel were ultimately re-issued to the merged entity, Unitel.

**B. VIMPELCOM Repurchased TAKILANT's Equity Interest in Unitel at a Premium**

54. Following the merger of Unitel and Butzel, VIMPELCOM sold TAKILANT an approximately seven percent ownership interest in the newly merged entity Unitel, and simultaneously entered

into an agreement to repurchase this seven percent ownership interest at a price that would guarantee that TAKILANT would almost triple its investment in less than three years.

55.   Specifically, on or about April 20, 2007, TAKILANT, VIMPELCOM and the holding company for Unitel entered into a Share Purchase Agreement, which provided that TAKILANT would purchase an interest in Unitel's holding company and thereby indirectly own approximately seven percent of the charter capital of Unitel for $20 million.

56.   As part of this agreement executed on or about April 20, 2007, VIMPELCOM agreed to repurchase TAKILANT's interest in Unitel for between $57.5 million and $60 million on a date between August 31, 2009 and November 30, 2009.

57.   On or about September 23, 2009, VIMPELCOM paid TAKILANT $57.5 million to repurchase TAKILANT's seven percent ownership interest in Unitel after TAKILANT exercised its rights under the April 2007 agreement.

58.   Upon information and belief, VIMPELCOM agreed to pay TAKILANT this high rate of return, which was nearly three times the price TAKILANT paid to purchase the interest at less than three years earlier, to induce GOVERNMENT OFFICIAL A to corruptly exercise his/her influence, including his/her ability to influence other Uzbek government officials, to assist

VIMPELCOM in entering and operating in the Uzbek telecommunications market.

## C. VIMPELCOM Made Corrupt Payments to TAKILANT in Order to Assist its Operations in the Uzbek Telecommunications Market

59.   Once VIMPELCOM began operating in the Uzbek telecommunications market through Unitel, VIMPELCOM entered into another contract with TAKILANT, and under the terms of this contract, VIMPELCOM agreed to pay TAKILANT $25 million in exchange for UzACI's agreement to grant Unitel rights to use certain frequencies that would be beneficial to Unitel's operations in the Uzbek telecom sector.

60.   Specifically, on or about October 29, 2007, VIMPELCOM's subsidiary entered into a contract with TAKILANT similar in terms to the agreement MTS executed with TAKILANT in 2008.   Pursuant to the terms of the VIMPELCOM agreement, VIMPELCOM's subsidiary would pay TAKILANT $25 million in exchange for TAKILANT's Uzbek subsidiary, TELESON, sending a formal waiver to UzACI "irrevocably repudiat[ing] all rights and interests . . . in and to [certain listed] frequency channels." Part of the $25 million payment, approximately $15 million, was contingent upon UzACI reissuing the repudiated frequencies to Unitel.

61.   On or about October 29, 2007, TELESON sent a letter to UzACI repudiating its rights to use the relevant frequencies.

On or about November 8, 2007, less than two weeks after the TELESON letter, UzACI granted Unitel rights to use the repudiated frequencies and amended its operating license to allow for the usage of the frequencies.  On or about November 8, 2007, AKHMEDOV emailed a scanned copy of Unitel's amended license to VIMPELCOM executives.

62.   Upon information and belief, VIMPELCOM paid $25 million to TAKILANT for the corrupt purpose of obtaining GOVERNMENT OFFICIAL A's influence, including his/her ability to influence other Uzbek government officials, to assist VIMPELCOM in operating in the Uzbekistan telecommunications market, based on the following facts and circumstances, among others:

a.   Upon information and belief, the transfer of the frequency rights in this manner was designed to circumvent Uzbek law prohibiting the direct transfer of frequencies, was non-transparent, and avoided a competitive bidding process.  According to materials prepared for an October 12, 2007 VIMPELCOM board meeting, "[a]s the rights to frequencies are not transferable in Uzbekistan and can not be sold, Takilant's subsidiary has agreed to waive its rights to the frequencies and we expect the frequencies to be reissued to Unitel."

    b.   Under Uzbek law, telecommunications companies could

obtain frequencies from the Uzbek government without

paying any upfront fees.  Thus, no part of the $25

million paid to TAKILANT was legally required to

obtain rights to use the frequencies in Uzbekistan.

    c.   TELESON only acquired the frequencies that it agreed

to repudiate on or about September 27, 2007, just over

one month before the contract with VIMPELCOM's

subsidiary was executed.  However, TAKILANT and

VIMPELCOM began negotiations to acquire these

frequencies before TELESON even obtained the

frequencies from UzACI.

    d.   TELESON's conduct circumvented the terms of the

license issued to it by UzACI, which provided that the

"[l]icensee cannot sell, in part or in full, or in any

other way transfer to a third party the rights or

obligations regarding this license."

## D. VIMPELCOM Used Sham Consulting Services Contracts to Conceal Corrupt Payments to TAKILANT

63.  On or about June 30, 2008, VIMPELCOM entered into a

purported consulting services contract with TAKILANT, under

which VIMPELCOM agreed to pay TAKILANT $2 million for consulting

services related to obtaining rights from UzACI to permit Unitel

to use 24 radio frequency channels.

64.    As early as 2006, VIMPELCOM board meeting minutes
reflected discussions by the board about a $2 million payment.
An Executive Summary prepared for a VIMPELCOM board meeting
occurring in or about April 2006, referenced a payment of $2
million for the partner's services in approximately nine
potential areas.

65.    On or about February 13, 2008, a VIMPELCOM executive
emailed other VIMPELCOM executives, explaining that "the
partner, referring to the previous verbal agreements, is coming
back to the issue [of $2 million] and [is] asking us to
recognize the obligations and to make payments."  Upon
information and belief, the partner is a reference to GOVERNMENT
OFFICIAL A and her representatives.

66.    Upon information and belief, certain VIMPELCOM
management then endeavored to explore methods of making the $2
million payment to TAKILANT to satisfy GOVERNMENT OFFICIAL A's
demand.  VIMPELCOM executives drafted paperwork, in consultation
with AKHMEDOV, to create false documents that would contain what
appear to be legitimate services TAKILANT could purport to
perform under a "service agreement."  The final service
agreement only required TAKILANT to provide services related to
"conducting negotiations, preparation, submission, and support
of documentation packages required to assign 24 channels" to
Unitel.

67.   Upon information and belief, certain members of VIMPELCOM management also explored payment methods that would ensure that these sham contractual payments would avoid undue scrutiny.  For example, on or about July 1, 2008, a VIMPELCOM executive emailed other VIMPELCOM executives, and wrote, "[AKHMEDOV] called.  He says that they have a strong desire to receive these funds from an offshore [company].  What are we going to do?"  On or about July 2, 2008, another VIMPELCOM executive responded, writing "we do not have approved loans in the jurisdictions where they do not closely look at the documents (we paid for 3G for Uzbekistan from BVI).  There is undrawn limit for 4 million in [a Dutch entity], but they have strict compliance – it will be necessary to prove with the documents that consulting services are provided . . . ."

68.   Several other aspects of the so-called consulting agreement demonstrate that it was a sham agreement to cover up the $2 million payment to TAKILANT.  First, at AKHMEDOV's request, VIMPELCOM drafted TAKILANT's invoice and service acceptance act, a formal document acknowledging that TAKILANT had provided the contracted services to VIMPELCOM.  In addition, the invoice, the service acceptance act, and the executed version of the consulting agreement between VIMPELCOM and TAKILANT were backdated to an earlier time period.  Furthermore, upon information and belief, TAKILANT did no work

concerning the "negotiations, preparation, submission, and support of documentation packages required to assign 24 channels" or any other legitimate work to justify the $2 million payment.

69.   On or about September 19, 2011, VIMPELCOM's subsidiary, Watertrail Industries Limited, and TAKILANT entered into a second sham consulting contract with TAKILANT, purportedly to enlist TAKILANT's services to assist Unitel in obtaining the rights to certain LTE frequencies.  Under this agreement, among other things, TAKILANT agreed to provide certain reports to VIMPELCOM and to negotiate with UzACI on behalf of VIMPELCOM and to provide documentation to UzACI.  The agreement further provided that, in return for these purported consulting services, within seven days of TAKILANT providing evidence that specific services were rendered, VIMPELCOM's subsidiary would pay TAKILANT $30 million.

70.   VIMPELCOM's subsidiary paid $30 million to TAKILANT pursuant to the terms of the purported consulting contract despite the fact that Unitel had no need for LTE frequencies, as Unitel lacked the ability to employ LTE frequencies in Uzbekistan in 2011 or the near future.

71.   On or about September 21, 2011, VIMPELCOM's subsidiary transferred $20 million to TAKILANT.  Thereafter, on or about October 18, 2011, UzACI issued a decision amending Unitel's

31

license to permit Unitel to use the LTE frequencies. VIMPELCOM'S subsidiary transferred the remaining $10 million to TAKILANT on or about the next day.

72.   A VIMPELCOM executive ("Whistleblower") was among the chief critics of the LTE consulting agreement between VIMPELCOM and TAKILANT, and repeatedly voiced serious anti-corruption concerns about the agreement to VIMPELCOM management both before and after the agreement was executed.   On or about August 20, 2011, Whistleblower emailed several VIMPELCOM executives explaining that Whistleblower was "very uncomfortable" and could "see no rationale" why "we are solely paying to the agent working for getting the license for us, and nothing to the [Uzbek] Government[.]"   Whistleblower compared the proposed consulting agreement to another "corruption case," which resulted in "heavy fines . . . plus criminal charges against the company and individual employees."

73.   On or about September 30, 2011, Whistleblower emailed a supervisor and complained that the LTE deal "reeks and doesn't look good."   On or about October 4, 2011 in an email, Whistleblower again raised concerns about the methods by which VIMPELCOM tried to obtain a license and indicated that these methods "may raise suspicions of complicity in corruption." Whistleblower emphasized that the agreement "smells like and resembles corruption."

74.    Upon information and belief, VIMPELCOM paid $32 million to TAKILANT for the corrupt purpose of obtaining GOVERNMENT OFFICIAL A's influence, including his/her ability to influence other Uzbek government officials, to assist VIMPELCOM in operating in the Uzbekistan telecommunications market, based on the following facts and circumstances, among others:

   a.   On or about October 18, 2011, within approximately 30 days of the signing of the September 19, 2011 consulting contract, TAKILANT submitted a report to VIMPELCOM "based on the work that [TAKILANT] . . . ha[d] done in the course of providing services to your Company."  The report was drafted in English, and was entitled "Marketing research on telecommunication services market and data transmission services market in Uzbekistan."

   b.   TAKILANT also submitted a second report, drafted in Russian, and entitled "An Analysis of the Existing Telecommunications Infrastructure of the Operators in Uzbekistan for Construction of an LTE Network[:] Preparation of Recommendations for Planning an LTE Network."

   c.   Large portions of both reports contained little or no original content, and appeared to rely instead on text copied directly from open source and other materials.

Parts of the English report contained similar or
identical language as that contained in Wikipedia
articles, blog entries, and PowerPoint presentations
from VIMPELCOM's telecommunications brand.  Parts of
the Russian report contained similar or identical
language as that contained in Wikipedia articles,
Verizon Wireless whitepapers, news articles, and
Beeline PowerPoint presentations.

d.    Under Uzbek law, telecommunications companies could
obtain frequencies from the Uzbek government without
paying any upfront fees.  Thus, no part of the $30
million paid to TAKILANT was legally required to
obtain rights to use the frequencies in Uzbekistan.

e.    At the time the consulting agreement related to
obtaining LTE frequencies was executed, there were
allegations in the press that TAKILANT was controlled
by family of a high-level government official.

## E. VIMPELCOM Used Purported "Reseller" Transactions to Make Corrupt Payments to TAKILANT

75.    Unitel entered into non-transparent transactions with
"reseller" companies to avoid significant currency conversion
restrictions in Uzbekistan and to overcome Unitel's inability to
use Uzbek som to obtain necessary foreign goods.  Pursuant to
these transactions with reseller companies, Unitel agreed to pay

34

a local Uzbek company in Uzbek currency.  In exchange, the local Uzbek company would pay a foreign vendor of a particular good or service in U.S. Dollars.  As a result of these transactions, TAKILANT received approximately $20 million.

76.    In or around 2011, VIMPELCOM used these nontransparent transactions with reseller companies to conceal a $10,000,023 payment to GOVERNMENT OFFICIAL A by entering into purported reseller transactions that benefitted TAKILANT.  To make this corrupt payment, Unitel entered into contracts with multiple Uzbek and foreign intermediary reseller companies for services that were unnecessary and/or were made at highly inflated prices.  These transactions were approved without sufficient justification and bypassed the normal approval processes. Unitel then made payments in Uzbek som to those Uzbek companies, which in turn, paid a purported subcontractor in Uzbek som.

77.    Thereafter, in or around February and March 2011, a company affiliated with the subcontractor sent approximately 14 payments totaling $10.5 million to a designated reseller company, and then an affiliate of that reseller company ("RESELLER COMPANY 1") sent approximately 14 wire payments, each under $1 million and totaling approximately $10,000,023, to TAKILANT's LOMBARD ODIER ACCOUNT.

78.    This $10,000,023 bribe payment to GOVERNMENT OFFICIAL A was achieved through a series of sham agreements whose only

35

purpose was to justify associated payments using a number of reseller companies based in Uzbekistan or elsewhere. The reseller companies used in these transactions were fungible, as no real work from the end recipient of the funds was expected as the payment was, in fact, a bribe.

79.   VIMPELCOM and Unitel used these transactions with reseller companies to make and conceal the $10,000,023 bribe to GOVERNMENT OFFICIAL A through TAKILANT. TAKILANT performed no services to justify a $10,000,023 payment, and there was no need for VIMPELCOM or Unitel to make any payments for the specific contracted services in U.S. dollars. By using the reseller scheme, VIMPELCOM and Unitel executives avoided additional scrutiny, including FCPA analysis, of the transactions and payments.

80.   In 2012, VIMPELCOM again made and concealed another $10 million bribe payment to GOVERNMENT OFFICIAL A through purported transactions with reseller companies. As in 2011, VIMPELCOM executives knew that the true purpose of these transactions was to funnel $10 million to TAKILANT, and they took efforts to ensure that the transactions were approved without unwanted scrutiny.

81.   Between in or around February and May 2012, Unitel again entered into contracts with multiple Uzbek and foreign intermediary reseller companies for services that were

unnecessary and/or were made at highly inflated prices and these transactions were approved without sufficient justification and bypassed the normal approval processes. Unitel then made payments in Uzbek som to those Uzbek companies, which in turn, paid a purported subcontractor in Uzbek som. Thereafter, in or around April and May 2012, a company affiliated with the subcontractor sent approximately 12 payments totaling over $10.5 million to a designated reseller company, and then that designated reseller company ("RESELLER COMPANY 2") sent approximately 13 wire payments, each under $1 million and totaling approximately $10 million, to TAKILANT's LOMBARD ODIER ACCOUNT.

82.   Unitel entered into these transactions even after a VIMPELCOM executive was alerted to serious concerns about one of the reseller companies that was used in the corrupt bribery scheme. On or about February 10, 2012, a Unitel employee emailed VIMPELCOM executives to complain that the employee had been "forced to sign a notice of voluntary [resignation]" after reporting problems after the employee's visit to the reseller company's office related to another tender. Specifically, the employee found, among other things, that the office was "located in an old run-down house [building], without any signage" and "[t]here were no specialists [technicians] there." The employee recommended against using the reseller company as a contractor

for Unitel, as it was "not qualified and there are big risks . . .

. ." The employee noted in the email that, in response to the

information the employee provided, the employee was warned by

Unitel personnel "not to interfere," and, when the employee

persisted, "they began to put pressure on me to resign."

83. Just as in 2011, VIMPELCOM and Unitel used these

transactions with reseller companies to make and conceal the $10

million bribe to GOVERNMENT OFFICIAL A through TAKILANT. In

addition, certain VIMPELCOM and Unitel management used U.S.-

based email accounts to communicate with others and effectuate

the scheme. TAKILANT performed no services to justify a $10

million payment, and there was no need for VIMPELCOM or Unitel

to make payments for the contracted services in U.S. dollars.

By again using the non-transparent reseller scheme, VIMPELCOM

and Unitel executives were able to avoid additional scrutiny,

including FCPA analysis, of the transactions and payments.

84. Upon information and belief, VIMPELCOM entered into

these transactions for the corrupt purpose of obtaining

GOVERNMENT OFFICIAL A's influence, including his/her ability to

influence other Uzbek government officials, in order to assist

VIMPELCOM in operating in the Uzbekistan telecommunications

market.

## F.   Details of Corrupt Payments Made to TAKILANT

85.   The following corrupt payments, described in the
preceding sections, were made by or on behalf of VIMPELCOM, a
subsidiary of a VIMPELCOM shareholder, AQUTE, or a reseller
company to TAKILANT.   At least $134,500,023 of these payments
were executed through transactions that were transferred into
and out of correspondent bank accounts at financial institutions
in New York, New York, including through J.P. Morgan Chase,
Standard Chartered Bank, Citibank, and Wells Fargo.

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| January 20, 2006 | AQUTE (the seller of Buztel and a subsidiary of a VIMPELCOM shareholder) | Amsterdam Trade Bank, Netherlands | TAKILANT | Aizkraukles, Latvia | $19,000,000 |
| November 7, 2007 | WATERTRAIL (a VIMPELCOM subsidiary) | ING Bank, Netherlands | TAKILANT | Parex, Latvia | $10,000,000 |
| November 9, 2007 | WATERTRAIL (a VIMPELCOM subsidiary) | ING Bank, Netherlands | TAKILANT | Parex, Latvia | $15,000,000 |
| August 8, 2008 | VIMPELCOM | Citibank, Russia | TAKILANT | Parex, Latvia | $2,000,000 |
| September 23, 2009 | VIMPELCOM | Citibank, Russia | TAKILANT | Standard Chartered, Hong Kong | $57,500,000 |
| March 3, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $780,000 |
| March 4, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $740,000 |
| March 4, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $889,644 |
| March 8, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $840,000 |

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| March 8, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $590,000 |
| March 9, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $910,320 |
| March 11, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $940,000 |
| March 11, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $980,000 |
| March 14, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $284,997 |
| March 14, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $740,000 |
| March 17, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $854,994 |
| March 21, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $980,000 |
| March 21, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $444,988 |
| March 24, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $25,080 |
| September 21, 2011 | WATERTRAIL (a VIMPELCOM subsidiary) | ING Bank, Netherlands | TAKILANT | Lombard Odier, Switzerland | $20,000,000 |
| October 19, 2011 | WATERTRAIL (a VIMPELCOM subsidiary) | ING Bank, Netherlands | TAKILANT | Lombard Odier, Switzerland | $10,000,000 |
| April 13, 2012 | RESELLER COMPANY 2 | Marfin Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $854,985 |
| April 20, 2012 | RESELLER COMPANY 2 | Cyprus Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $854,985 |
| April 24, 2012 | RESELLER COMPANY 2 | Cyprus Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $892,702 |
| April 24, 2012 | RESELLER COMPANY 2 | Cyprus Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $854,985 |
| April 24, 2012 | RESELLER COMPANY 2 | Cyprus Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $854,985 |

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| April 24, 2012 | RESELLER COMPANY 2 | Cyprus Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $799,027 |
| April 25, 2012 | RESELLER COMPANY 2 | Cyprus Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $892,702 |
| April 25, 2012 | RESELLER COMPANY 2 | Cyprus Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $854,985 |
| April 25, 2012 | RESELLER COMPANY 2 | Cyprus Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $854,985 |
| April 25, 2012 | RESELLER COMPANY 2 | Cyprus Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $854,985 |
| April 26, 2012 | RESELLER COMPANY 2 | Cyprus Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $845,985 |
| May 4, 2012 | RESELLER COMPANY 2 | Cyprus Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $575,689 |
| May 17, 2012 | RESELLER COMPANY 2 | Cyprus Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $9,000 |
| | | | | **TOTAL** | $153,500,023 |

## TELIASONERA'S ACTIVITIES IN UZBEKISTAN

### A. TELIASONERA Entered into a Corrupt Partnership Agreement with TAKILANT to Gain Access to the Uzbek Telecommunications Market

86.   TELIASONERA entered the Uzbek telecommunications market in 2007 after purchasing Coscom, an Uzbek telecom company.  Upon information and belief, executives at TELIASONERA understood prior to the purchase of Coscom, that in order to make this purchase, they had to enter into a partnership agreement with GOVERNMENT OFFICIAL A's shell company, TAKILANT.

87.    In or around 2007, Coscom's parent corporation

attempted to sell Coscom to a Qatari based company (the "Qatari

Corporation").   During this time period, representatives of

FINTUR HOLDINGS ("FINTUR"), TELIASONERA's majority owned

subsidiary that was assisting TELIASONERA in entering the Uzbek

telecommunications market, understood that representatives of

the Uzbek Government had opposed the sale to the Qatari

Corporation.

88.    In or around February 2007, during the time of the

negotiations with the Qatari Corporation were occurring, UzACI

ordered Coscom to shut down its telecommunications network in

Uzbekistan, making it impossible for Coscom's subscribers to

place telephone calls.

89.    In or around February and March 2007, representatives

of FINTUR, knowing that UzACI had shut down Coscom's

telecommunications network, understood that they needed to

obtain the approval of the Uzbek Government before attempting to

acquire Coscom, and sought to obtain support from GOVERNMENT

OFFICIAL A in order to make this acquisition.

90.    In or around May 2007, FINTUR reached a preliminary

agreement to enter into a potential partnership with AKHMEDOV,

as the representative of GOVERNMENT OFFICIAL A.    On or about

July 4, 2007, a TELIASONERA subsidiary entered into a

partnership agreement with an "Uzbek Partner," which was signed

by AKHMEDOV. As part of the partnership arrangement, AKHMEDOV
sent TELIASONERA a letter from UzACI supporting TELIASONERA's
investment in Uzbekistan's mobile telecommunications market.

91.   On or about July 16, 2007, after the preliminary
partnership agreement was executed, TELIASONERA finalized its
purchase of Coscom.   As a result of this purchase,
TELIASONERA's subsidiary, TELIASONERA UZBEK TELECOM HOLDING B.V.
("TELIASONERA UZBEK"), acquired a 99.97 percent ownership
interest in Coscom and TELIASONERA's subsidiary, TELIASONERA UTA
HOLDING B.V. ("TELIASONERA UTA"), acquired the remaining .03
percent.   TELIASONERA, through its subsidiaries, continued to
operate Coscom under the name Coscom in Uzbekistan.

B.   **TELIASONERA Corruptly Paid TAKILANT $30 Million to Obtain 3G**
     **Frequencies and a Number Block Beneficial for Operating in the**
     **Uzbek Telecommunications Market**

92.   Following its purchase of Coscom, TELIASONERA and its
subsidiary paid TAKILANT a net payment of $30 million and a 26
percent ownership interest in TELIASONERA UZBEK.

93.   Specifically, on or about December 24, 2007, TAKILANT
entered into a contract with TELIASONERA UZBEK, which provided
that TELIASONERA UZBEK would pay TAKILANT $80 million if
TAKILANT's Uzbek subsidiary, TELESON, sent a formal waiver
letter to UzACI repudiating its rights to use certain 3G
frequencies and a numbering block.   On or about the same day,
TAKILANT also entered into a Shareholders Agreement with

43

TELIASONERA UZBEK and TELIASONERA UTA, whereby TAKILANT earned
the right to purchase a 26 percent ownership interest in
TELIASONERA UZBEK for $50 million once the conditions of the
former contract were fulfilled.

94.    Pursuant to the first contract, TELIASONERA UZBEK
agreed to pay TAKILANT $80 million if TAKILANT's Uzbek
subsidiary, TELESON, sent a formal waiver to UzACI "irrevocably
repudiat[ing] all rights and interests . . . in and to [certain
listed] frequency channels."  Part of the payment was
contingent, requiring UzACI to reissue the repudiated
frequencies to TELIASONERA's Uzbek operator, Coscom, before $72
million of the $80 million would be paid.

95.    On or about December 27, 2007, the frequencies and
number block originally held by TELESON were reassigned to
TELIASONERA's Uzbek operator, Coscom.  UzACI issued the orders
reallocating these assets to Coscom.

96.    On or about December 27, 2007, TELIASONERA transferred
the $80 million payment to TAKILANT for the acquisition of these
3G frequencies and number block.  The next day, on or about
December 28, 2007, TAKILANT transferred $50 million to
TELIASONERA UTA to purchase the remaining 26 percent ownership
interest in TELIASONERA UZBEK.

97.    Upon information and belief, TELIASONERA entered into
these contracts with TAKILANT for the corrupt purpose of

44

obtaining GOVERNMENT OFFICIAL A's influence, including his/her
ability to influence other Uzbek government officials, to assist
TELIASONERA in operating in the Uzbekistan telecommunications
market, based on the following facts and circumstances, among
others.

> a.    TAKILANT entered into the purchase agreement with
>        TELIASONERA UZBEK less than three months after TELESON
>        first acquired the number block and frequencies that
>        it later agreed to repudiate.
>
> b.    TELESON was only registered as a legal entity
>        beginning on or about September 10, 2007.
>
> c.    Upon information and belief, the transfer of the
>        frequency rights in this manner was designed to
>        circumvent Uzbek law prohibiting the direct transfer
>        of frequencies, was non-transparent, and avoided a
>        competitive bidding process.

## C. Less than Three Years Later TELIASONERA Repurchased a Share of TAKILANT's Equity Interest at More Than Four Times TAKILANT's Original Purchase Price

98.    In or around February 2010, TELIASONERA paid TAKILANT
$220 million to repurchase a 20 percent ownership interest in
TELIASONERA UZBEK, less than three years after TAKILANT had
initially acquired 26 percent of TELIASONERA UZBEK for $50
million.

99.    The $220 million repurchase price paid to TAKILANT in 2010 exceeded the repurchase price initially specified in the Shareholders Agreement entered into with TELIASONERA UZBEK and TELIASONERA UTA by more than $100 million.   Pursuant to the Shareholders Agreement executed in 2007, TELIASONERA was only obligated to pay $112.5 million to repurchase TAKILANT's 26 percent interest in TELIASONERA UZBEK.

100. Additionally, on or about May 31, 2010, after repurchasing TAKILANT's 20 percent interest in TELIASONERA UTA, TELIASONERA UTA, TELIASONERA UZBEK, and TAKILANT entered into an Amendment to the Shareholders Agreement, which provided that TELIASONERA UTA could purchase TAKILANT's remaining 6 percent interest for not less than $75 million.

101. TELIASONERA agreed to repurchase TAKILANT's 20 percent interest at this increased price at least in part because TAKILANT was understood to have beneficial political connections in Uzbekistan.  As a TELIASONERA executive acknowledged, "[t]he success of [Coscom] . . . has to a large extent been dependent on the support from Takilant."  Additionally, in exchange for purchasing TAKILANT's interest, TAKILANT agreed to assist TELIASONERA in converting Uzbek currency, renewing Coscom's licenses, and obtaining an additional LTE license.

102. Upon information and belief, TELIASONERA paid this premium to TAKILANT for the corrupt purpose of obtaining

GOVERNMENT OFFICIAL A's influence, including his/her ability to influence other Uzbek government officials, to assist TELIASONERA in operating in the Uzbek mobile telecommunications market.

## D. TELIASONERA's Subsidiary Also Made Corrupt Payments to TAKILANT to Obtain a Number Block and a Network Code Beneficial for Operating in the Uzbek Telecommunications Market

103.  On or about August 20, 2008, TELIASONERA UZBEK agreed to pay TAKILANT $9.2 million if TAKILANT assisted Coscom in obtaining rights to use certain number blocks and a network connection code from UzACI.

104.  Pursuant to this agreement, TELESON agreed to send a formal waiver to UzACI, "repudiat[ing], waiv[ing] and terminat[ing] all rights and claim to the Number Block/Network Code Allocations."  The payment was contingent, requiring UzACI to reissue the repudiated Number Block/Network Code to Coscom before $5.2 million of the $9.2 million would be paid to TAKILANT.

105.  On or about August 26, 2008, UzACI issued an order granting Coscom permission to use the number block and network connection code repudiated by TELESON.

106.  Upon information and belief, TELIASONERA paid $9.2 million to TAKILANT for the corrupt purpose of obtaining GOVERNMENT OFFICIAL A's influence, including his/her ability to

influence other Uzbek government officials, to assist

TELIASONERA in operating in the Uzbekistan telecommunications

market.

### E. TELIASONERA Made Corrupt Payments to TAKILANT to Obtain LTE Frequencies and Other Assets Beneficial for Operating in the Uzbek Telecommunications Market

107. In 2010, TELIASONERA UZBEK contracted with TAKILANT to

obtain LTE frequencies and a long term lease agreement for

Coscom.

108. On or about November 1, 2010, TELIASONERA UZBEK

entered into an agreement with TAKILANT, which stated in part

that TELIASONERA UZBEK "is desirous of acquiring for COSCOM

additional LTE frequency allocation within the territory of

Uzbekistan."   Pursuant to this agreement, among other things,

TAKILANT agreed to conduct negotiations and to prepare

documentation in order to obtain permission from UzACI allowing

Coscom to use certain frequencies in Uzbekistan.   In exchange

for these services, TELIASONERA UZBEK agreed to pay TAKILANT $55

million.

109. On or about November 26, 2010, UzACI granted Coscom

the rights to use the additional frequencies, which had

previously been held and waived by Uzdunrobita.

110. Upon information and belief, TELIASONERA paid $55

million to TAKILANT for the corrupt purpose of obtaining

GOVERNMENT OFFICIAL A's influence, including his/her ability to

influence other Uzbek government officials, to assist
TELIASONERA in operating in the Uzbekistan telecommunications
market, based on the following facts and circumstances, among
others:

a.    At the time the agreement was executed, TAKILANT did
      not own the frequencies that TELIASONERA sought to
      acquire.  Instead, they were owned by MTS's
      subsidiary, Uzdunrobita.  Subsequently, pursuant to a
      due diligence investigation, TAKILANT stated that the
      payment it received included payment for not
      exercising TAKILANT's option to acquire the relevant
      frequencies.

b.    Upon information and belief, the transfer of the
      frequency rights in this manner was designed to
      circumvent Uzbek law prohibiting the direct transfer
      of frequencies, was non-transparent, and avoided a
      competitive bidding process.

c.    Since under Uzbek law, telecommunications companies
      could obtain frequencies from the Uzbek government
      without paying any upfront fees, no part of the $55
      million paid to TAKILANT was legally required to
      obtain rights to use the frequencies in Uzbekistan.

**F. Details of Corrupt Payments made by TELIASONERA to TAKILANT**

111. The following corrupt payments, described in the preceding sections, were made by or on behalf of TELIASONERA to TAKILANT. These payments were executed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York, including through J.P. Morgan Chase, Standard Chartered, Deutsche Bank, and Citibank.

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| December 27, 2007 | TELIASONERA | Svenska Handelsbanken, Sweden | TAKILANT | Parex, Latvia | $80,000,000 |
| February 2, 2010 | Derdengelden Notariaat Houthoff (on behalf of TELIASONERA) | Fortis Bank, Netherlands | TAKILANT | Standard Chartered, Hong Kong | $220,000,000 |
| September 16, 2008 | TELIASONERA UZBEK (a TELIASONERA subsidiary) | ING Bank, Netherlands | TAKILANT | Parex, Latvia | $9,200,000 |
| December 16, 2010 | TELIASONERA | Svenska Handelsbanken, Netherlands | TAKILANT | Lombard Odier, Switzerland | $55,000,000 |
| | | | | TOTAL | $364,200,000 |

## LAUNDERING OF THE CORRUPTION PROCEEDS

112. During the time period described herein, in or about 2004 through in or about 2013, after GOVERNMENT OFFICIAL A's shell companies received more than $800 million from VIMPELCOM, MTS, and TELIASONERA, GOVERNMENT OFFICIAL A's associates engaged in an international conspiracy and a complicated series of monetary transactions in order to launder GOVERNMENT OFFICIAL A's corrupt proceeds. To launder these payments, GOVERNMENT

OFFICIAL A's associates used shell companies and nominees, executed cross-border transactions, and commingled the corruption proceeds with other funds. In furtherance of this laundering scheme, GOVERNMENT OFFICIAL A's associates deposited funds in bank accounts located in Switzerland, and also transferred funds through various monetary transactions into and out of U.S. correspondent bank accounts at financial institutions in New York, New York.

## A. Opening the Defendant Property Accounts

113. In or around February 2009, TAKILANT opened a corporate account at Lombard Odier Darier Hentsch & Cie ("TAKILANT's LOMBARD ODIER ACCOUNT"). In or around April 2011, TOZIAN LIMITED ("TOZIAN") also opened an account at Lombard Odier Darier Hentsch & Cie ("TOZIAN's LOMBARD ODIER ACCOUNT").

114. TOZIAN was incorporated in the British Virgin Islands in June 2008. During the relevant time period, the sole shareholder and director of TOZIAN was AVAKYAN.

## B. Funds Transferred from TAKILANT's Parex Account into TAKILANT's LOMBARD ODIER ACCOUNT

115. As described below, a portion of the funds deposited into TAKILANT's LOMBARD ODIER ACCOUNT originated from TAKILANT's Parex Account.

116. In or around December 2007 through October 2008, TELIASONERA, VIMPELCOM, and MTS collectively deposited $66.2

million into TAKILANT's Parex Account, as described in the following table.  These payments were executed through transactions into and out of U.S. correspondent bank accounts at financial institutions in New York, New York.

   a. On or about December 27, 2007, TELIASONERA transferred
      $80 million into TAKILANT's Parex Account as payment
      for assisting TELIASONERA's Uzbek operator, Coscom, in
      acquiring certain frequencies and number blocks,
      discussed herein at paragraphs 92-97.  On or about
      December 28, 2007, TAKILANT's Parex Account
      transferred $50 million as payment to acquire 26
      percent of TELIASONERA UTA, described herein at
      paragraphs 92-97.

   b. On or about August 8, 2008, VIMPELCOM transferred $2
      million into TAKILANT's Parex Account as payment for
      assisting VIMPELCOM's Uzbek operator, Unitel, in
      acquiring certain frequency channels, discussed herein
      at paragraphs 63-68.

   c. On or about September 16, 2008, TELIASONERA UZBEK
      transferred $9.2 million into TAKILANT's Parex Account
      as payment for assisting Coscom in acquiring number
      blocks and a network connection code, discussed herein
      at paragraphs 103-106.

d. On or about October 21, 2008, MTS transferred $5

million into TAKILANT's Parex Account as payment for

assisting MTS's Uzbek operator, Uzdunrobita, in

acquiring certain frequencies, discussed herein at

paragraphs 37-42.

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| December 27, 2007 | TELIASONERA | Svenska Handelsbanken, Sweden | TAKILANT | Parex, Latvia | $30,000,000 (net payment) |
| August 8, 2008 | VIMPELCOM | Citibank, Russia | TAKILANT | Parex, Latvia | $2,000,000 |
| September 16, 2008 | TELIASONERA UZBEK (a TELIASONERA subsidiary) | ING Bank, Netherlands | TAKILANT | Parex, Latvia | $9,200,000 |
| October 21, 2008 | MTS | Moscow Bank for Reconstruction and Development, Russia | TAKILANT | Parex, Latvia | $5,000,000 |
| | | | | TOTAL | $66,200,000 |

117. These funds subsequently were commingled with other

funds deposited into TAKILANT's Parex Account.  Thereafter,

TAKILANT transferred $102,864,623.01 from its Parex Account to

TAKILANT's LOMBARD ODIER ACCOUNT, as described in the following

table.

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| June 30, 2009 | TAKILANT | Parex Bank, Latvia | TAKILANT | Lombard Odier, Switzerland | $154,513.00* |
| July 10, 2009 | TAKILANT | Parex Bank, Latvia | TAKILANT | Lombard Odier, Switzerland | $285,000.00 |
| August 5, 2009 | TAKILANT | Parex Bank, Latvia | TAKILANT | Lombard Odier, Switzerland | $1,230,000.00 |

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| September 8, 2009 | TAKILANT | Parex Bank, Latvia | TAKILANT | Lombard Odier, Switzerland | $185,000.00 |
| September 11, 2009 | TAKILANT | Parex Bank, Latvia | TAKILANT | Lombard Odier, Switzerland | $200,000.00 |
| May 17, 2010 | TAKILANT | Parex Bank, Latvia | TAKILANT | Lombard Odier, Switzerland | $465,000.00 |
| December 23, 2010 | TAKILANT | Parex Bank, Latvia | TAKILANT | Lombard Odier, Switzerland | $7,664,085.00* |
| December 29, 2010 | TAKILANT | Parex Bank, Latvia | TAKILANT | Lombard Odier, Switzerland | $1,100,000.00 |
| February 2, 2011 | TAKILANT | Parex Bank, Latvia | TAKILANT | Lombard Odier, Switzerland | $270,000.00 |
| February 2, 2011 | TAKILANT | Parex Bank, Latvia | TAKILANT | Lombard Odier, Switzerland | $689,950.00* |
| April 21, 2011 | TAKILANT | Parex Bank, Latvia | TAKILANT | Lombard Odier, Switzerland | $380,000.00 |
| April 21, 2011 | TAKILANT | Parex Bank, Latvia | TAKILANT | Lombard Odier, Switzerland | $1,020,950.00* |
| October 5, 2011 | TAKILANT | Parex Bank, Latvia | TAKILANT | Lombard Odier, Switzerland | $161,935.20* |
| October 5, 2011 | TAKILANT | Parex Bank, Latvia | TAKILANT | Lombard Odier, Switzerland | $1,166,909.00 |
| November 15, 2011 | TAKILANT | Parex Bank, Latvia | TAKILANT | Lombard Odier, Switzerland | $10,000,000.00 |
| January 13, 2012 | TAKILANT | Parex Bank, Latvia | TAKILANT | Lombard Odier, Switzerland | $36,993,452.57* |
| January 13, 2012 | TAKILANT | Parex Bank, Latvia | TAKILANT | Lombard Odier, Switzerland | $40,897,828.24 |
| | | | | **TOTAL** | $102,864,623.01 |

\* These transfers were conducted in Euros. The value listed in USD is based on the historical exchange rate identified by the Federal Reserve.

**C. Funds Transferred from TAKILANT's Standard Chartered Account into TAKILANT's LOMBARD ODIER ACCOUNT**

118.  As described below, a portion of the funds deposited into TAKILANT's LOMBARD ODIER ACCOUNT originated from TAKILANT's Standard Chartered Account.

119.  TELIASONERA, VIMPELCOM, and MTS collectively deposited $302.5 million into TAKILANT's Standard Chartered Account during the time period of in or around February 2009 through February 2010, as described in the following table.  At least $282,500,000 in payments were executed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

> a. From in or around February 2009 through June 2009, MTS and its subsidiary cumulatively transferred $25 million into TAKILANT's Standard Chartered Account as payment for assisting MTS's Uzbek operator, Uzdunrobita, in acquiring certain frequencies, discussed herein at paragraphs 37-42.

> b. On or about September 23, 2009, VIMPELCOM transferred $57.5 million into TAKILANT's Standard Chartered Account in order to repurchase TAKILANT's seven percent indirect interest in Unitel, discussed herein at paragraphs 54-58.

c. On or about February 2, 2010, TELIASONERA transferred
$220 million into TAKILANT's Standard Chartered
Account in order to repurchase TAKILANT's 20 percent
interest in TELIASONERA UZBEK, discussed herein at
paragraphs 98-102.

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| February 7, 2009 | MTS Bermuda | ING Bank, Netherlands | TAKILANT | Standard Chartered, Hong Kong | $5,000,000 |
| March 5, 2009 | MTS Bermuda | ING Bank, Netherlands | TAKILANT | Standard Chartered, Hong Kong | $5,000,000 |
| April 28, 2009 | MTS Bermuda | ING Bank, Netherlands | TAKILANT | Standard Chartered, Hong Kong | $5,000,000 |
| June 18, 2009 | MTS Bermuda | ING Bank, Netherlands | TAKILANT | Standard Chartered, Hong Kong | $5,000,000 |
| July 14, 2009 | MTS | Moscow Bank for Reconstruction and Development, Russia | TAKILANT | Standard Chartered, Hong Kong | $5,000,000 |
| September 23, 2009 | VIMPELCOM | Citibank, Russia | TAKILANT | Standard Chartered, Hong Kong | $57,500,000 |
| February 2, 2010 | Derdengelden Notariaat Houthoff (on behalf of TELIASONERA) | Fortis Bank, Netherlands | TAKILANT | Standard Chartered, Hong Kong | $220,000,000 |
| | | | | TOTAL | $302,500,000 |

120. These funds subsequently were commingled with other
funds deposited into TAKILANT's Standard Chartered Account.

121. A portion of the funds held in TAKILANT's Standard
Chartered Account were placed into time deposit accounts held at
Standard Chartered Bank that earned interest, as described in
the following table.

| Deposit Date (On or about) | Originating Party | Originating Bank | Beneficial Account | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| July 20, 2010 | TAKILANT | Standard Chartered, Hong Kong | TIME DEPOSIT ACCT ENDING - 22405 | Standard Chartered, Hong Kong | $60,300,000.00 |
| February 11, 2010 | TAKILANT | Standard Chartered, Hong Kong | TIME DEPOSIT ACCT ENDING - 82058 | Standard Chartered, Hong Kong | $220,000,000.00 |
| | | | | TOTAL | $280,300,000.00 |

122.   From on or about March 18, 2009 through November 12, 2010, TAKILANT transferred $315,089,748.10 from its Standard Chartered Account to TAKILANT's LOMBARD ODIER ACCOUNT, as described in the following table.

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| March 18, 2009 | TAKILANT | Standard Chartered, Hong Kong | TAKILANT | Lombard Odier, Switzerland | $7,300,000.00 |
| March 24, 2009 | TAKILANT | Standard Chartered, Hong Kong | TAKILANT | Lombard Odier, Switzerland | $1,000,000.00 |
| May 6, 2009 | TAKILANT | Standard Chartered, Hong Kong | TAKILANT | Lombard Odier, Switzerland | $5,000,000.00 |
| May 11, 2009 | TAKILANT | Standard Chartered, Hong Kong | TAKILANT | Lombard Odier, Switzerland | $4,000,000.00 |
| June 24, 2009 | TAKILANT | Standard Chartered, Hong Kong | TAKILANT | Lombard Odier, Switzerland | $5,000,000.00 |
| October 2, 2009 | TAKILANT | Standard Chartered, Hong Kong | TAKILANT | Lombard Odier, Switzerland | $9,500,000.00 |
| August 18, 2010 | TAKILANT | Standard Chartered, Hong Kong | TAKILANT | Lombard Odier, Switzerland | $50,000.00 |
| August 19, 2010 | TAKILANT | Standard Chartered, Hong Kong | TAKILANT | Lombard Odier, Switzerland | $2,145,000.00 |
| September 9, 2010 | TAKILANT | Standard Chartered, Hong Kong | TAKILANT | Lombard Odier, Switzerland | $192,000.00 |

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| October 20, 2010 | Time Deposit Account Ending in - 22405 | Standard Chartered, Hong Kong | TAKILANT | Lombard Odier, Switzerland | $60,400,106.36 |
| November 12, 2010 | Time Deposit Account Ending in - 82058 | Standard Chartered, Hong Kong | TAKILANT | Lombard Odier, Switzerland | $220,502,641.74 |
| | | | | TOTAL | $315,089,748.10 |

123.   Additionally, from on or about May 6, 2009 through September 6, 2010, TAKILANT transferred an additional approximately $31,860,007.11 from its Euro Denominated Account at Standard Chartered Bank to TAKILANT's LOMBARD ODIER ACCOUNT, as described in the following table.

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| May 6, 2009 | TAKILANT | Standard Chartered, Hong Kong | TAKILANT | Lombard Odier, Switzerland | $13,326,313* |
| August 19, 2010 | TAKILANT | Standard Chartered, Hong Kong | TAKILANT | Lombard Odier, Switzerland | $105,263.40* |
| September 6, 2010 | TAKILANT | Standard Chartered, Hong Kong | TAKILANT | Lombard Odier, Switzerland | $18,428,430.71* |
| | | | | TOTAL | $31,860,007.11 |
| * These transfers were conducted in Euros.  The value listed in USD is based on the historical exchange rate identified by the Federal Reserve | | | | | |

124.  The funds held in TAKILANT's Euro Denominated Account at Standard Chartered Bank originated from TAKILANT's Standard Chartered Account and subsequently were invested in time deposits.

**D. Funds Transferred from TELIASONERA and VIMPELCOM into TAKILANT's LOMBARD ODIER ACCOUNT**

125. As described below, TELIASONERA and VIMPELCOM, in part through VIMPELCOM's subsidiary and reseller transactions, collectively deposited $105,000,023 into TAKILANT's LOMBARD ODIER ACCOUNT during the time period of on or about December 2010 through May 2012. These payments were executed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

a. On or about December 16, 2010, TELIASONERA transferred $55 million into TAKILANT's LOMBARD ODIER ACCOUNT as payment for assisting Coscom in obtaining additional frequencies among other assets, discussed herein at paragraphs 107-110.

b. Between on or about March 3, 2011 and March 24, 2011, RESELLER COMPANY 1 sent approximately 14 wire payments, each under $1 million and totaling $10,000,023, to TAKILANT, discussed herein at paragraphs 75-84.

c. On or about September 21, 2011, VIMPELCOM's subsidiary transferred $20 million into TAKILANT's LOMBARD ODIER ACCOUNT as payment for assisting Unitel in obtaining the rights to use certain frequency channels, discussed herein at paragraphs 69-74.

d. On or about October 19, 2011, VIMPELCOM's subsidiary
transferred $10 million into TAKILANT's LOMBARD ODIER
ACCOUNT as payment for assisting Unitel in obtaining
the rights to use certain frequency channels,
discussed herein at paragraphs 69-74.

e. Between on or about April 13, 2012 and May 17, 2012,
RESELLER COMPANY 2 sent approximately 13 wire
payments, each under $1 million and totaling $10
million, to TAKILANT, discussed herein at paragraphs
75-84.

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| December 16, 2010 | TELIASONERA | Svenska Handelsbanken, Netherlands | TAKILANT | Lombard Odier, Switzerland | $55,000,000 |
| March 3, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $780,000 |
| March 4, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $740,000 |
| March 4, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $889,644 |
| March 8, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $840,000 |
| March 8, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $590,000 |
| March 9, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $910,320 |
| March 11, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $940,000 |
| March 11, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $980,000 |
| March 14, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $284,997 |

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| March 14, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $740,000 |
| March 17, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $854,994 |
| March 21, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $980,000 |
| March 21, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $444,988 |
| March 24, 2011 | RESELLER COMPANY 1 | Hellenic Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $25,080 |
| September 21, 2011 | WATERTRAIL (a VIMPELCOM subsidiary) | ING Bank, Netherlands | TAKILANT | Lombard Odier, Switzerland | $20,000,000 |
| October 19, 2011 | WATERTRAIL (a VIMPELCOM subsidiary) | ING Bank, Netherlands | TAKILANT | Lombard Odier, Switzerland | $10,000,000 |
| April 13, 2012 | RESELLER COMPANY 2 | Marfin Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $854,985 |
| April 20, 2012 | RESELLER COMPANY 2 | Cyprus Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $854,985 |
| April 24, 2012 | RESELLER COMPANY 2 | Cyprus Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $892,702 |
| April 24, 2012 | RESELLER COMPANY 2 | Cyprus Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $854,985 |
| April 24, 2012 | RESELLER COMPANY 2 | Cyprus Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $854,985 |
| April 24, 2012 | RESELLER COMPANY 2 | Cyprus Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $799,027 |
| April 25, 2012 | RESELLER COMPANY 2 | Cyprus Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $892,702 |
| April 25, 2012 | RESELLER COMPANY 2 | Cyprus Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $854,985 |
| April 25, 2012 | RESELLER COMPANY 2 | Cyprus Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $854,985 |
| April 25, 2012 | RESELLER COMPANY 2 | Cyprus Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $854,985 |

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| April 26, 2012 | RESELLER COMPANY 2 | Cyprus Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $845,985 |
| May 4, 2012 | RESELLER COMPANY 2 | Cyprus Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $575,689 |
| May 17, 2012 | RESELLER COMPANY 2 | Cyprus Popular Bank, Cyprus | TAKILANT | Lombard Odier, Switzerland | $9,000 |
| | | | | TOTAL | $105,000,023 |

### E. Total Funds Deposited into TAKILANT's LOMBARD ODIER ACCOUNT

126.  As described above, the funds held in TAKILANT's LOMBARD ODIER ACCOUNT are traceable to payments made by VIMPELCOM, MTS, and TELIASONERA, or to funds involved in the laundering of those payments.

| Date Range (On or about) | Description | Amount |
|---|---|---|
| December 2010 – May 2012 | Payments from or on behalf of the TELECOM COMPANIES to TAKILANT's LOMBARD ODIER ACCOUNT | $105,000,023.00 |
| June 2009 – January 2012 | Transfers from TAKILANT's Parex Account to TAKILANT's LOMBARD ODIER ACCOUNT | $102,864,623.01 |
| March 2009 – November 2010 | Transfers from TAKILANT's Standard Chartered Accounts to TAKILANT's LOMBARD ODIER ACCOUNT | $346,949,755.21 |
| | TOTAL | $554,814,401.22 |

127.  After these funds were deposited into TAKILANT's LOMBARD ODIER ACCOUNT, they were commingled with other funds deposited into the account.

128.  According to a bank statement dated March 31, 2014, this account held approximately $373,080,893 in funds.

129.  Thus, upon information and belief, the funds deposited into TAKILANT's LOMBARD ODIER ACCOUNT constituted or were

derived from the TELECOM COMPANIES' corrupt payments made for

the benefit of GOVERNMENT OFFICIAL A or were involved in

international money laundering.

**F. Funds Transferred from TAKILANT's LOMBARD ODIER ACCOUNT to TOZIAN's LOMBARD ODIER ACCOUNT**

130. As described below, a portion of the funds deposited

into TAKILANT's LOMBARD ODIER ACCOUNT were transferred to

TOZIAN's LOMBARD ODIER ACCOUNT, as described in the following

table:

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| April 11, 2010 | TAKILANT | Lombard Odier, Switzerland | TOZIAN | Lombard Odier, Switzerland | $200,000,000 |
| June 28, 2011 | TAKILANT | Lombard Odier, Switzerland | TOZIAN | Lombard Odier, Switzerland | $287,360* |
| | | | | TOTAL | $200,287,360 |
| * This transfer was conducted in Euros. The value listed in USD is based on the historical exchange rate identified by the Federal Reserve. | | | | | |

131. Before the deposit occurring on or about April 11,

2010, TOZIAN's LOMBARD ODIER ACCOUNT had a balance of zero

dollars.

132. On or about June 28, 2011, €93,020 was transferred

from TOZIAN'S LOMBARD ODIER ACCOUNT to an account held by

GOVERNMENT OFFICIAL A, leaving an account balance of

$200,128,527.

133. On or about November 11, 2011, $3,500,000.00 was

transferred from TOZIAN's LOMBARD ODIER ACCOUNT to an account

held by TOZIAN at Union Bancaire Privee in Switzerland

("TOZIAN's UBP ACCOUNT").

134. As of on or about November 24, 2011, the total value

of the assets held in TOZIAN's LOMBARD ODIER ACCOUNT was

$198,919,748.

135. Thus, upon information and belief, up to $198,919,748

in funds deposited into TOZIAN's LOMBARD ODIER ACCOUNT and up to

$3.5 million in TOZIAN'S UBP ACCOUNT constitute or were derived

from the TELECOM COMPANIES' corrupt payments made for the

benefit of GOVERNMENT OFFICIAL A or were involved in

international money laundering.

### IV. CLAIMS FOR FORFEITURE

### FIRST CLAIM FOR FORFEITURE

136. The United States incorporates by reference paragraphs

1 through 135 above as if fully set forth herein.

137. Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property,

real or personal, which constitutes or is derived from proceeds

traceable to . . . any offense constituting 'specified unlawful

activity'" is subject to forfeiture to the United States.

138. "Specified unlawful activity" is defined in 18 U.S.C.

§ 1956(c)(7)(D) to include any felony violation of the Foreign

Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd-1 et seq.

139. As set forth above, the Defendant Properties

constitute or are derived from proceeds traceable to felony

violations of the Foreign Corrupt Practices Act, or a conspiracy to commit such an offense.

140. As such, the Defendant Properties are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), on the grounds that they constitute or are derived from proceeds traceable to a specified unlawful activity or a conspiracy to commit such an offense.

## SECOND CLAIM FOR FORFEITURE

141. The United States incorporates by reference paragraphs 1 through 135 above as if fully set forth herein.

142. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1957], or any property traceable to such property," is subject to forfeiture to the United States.

143. 18 U.S.C. § 1957 imposes a criminal penalty on any person who:

> knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity.

144. For purposes of Section 1957, "specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7) to include any felony violation of the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd-1 *et seq.*

145. As set forth above, the Defendant Properties were the subjects of, or traceable to, monetary transactions or attempted transactions involving criminally-derived property of a value greater than $10,000 and, for the reasons set forth above, the funds involved in those transactions were derived from specified unlawful activity, that is, violations of the Foreign Corrupt Practices Act.

146. Therefore, the defendants in rem are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), on the grounds that they were involved in transactions or attempted transactions in violation of 18 U.S.C. § 1957, or are traceable to such property.

### THIRD CLAIM FOR FORFEITURE

147. The United States incorporates by reference paragraphs 1 through 135 above as if fully set forth herein.

148. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956], or any property traceable to such property," is subject to forfeiture to the United States.

149. 18 U.S.C. § 1956(a)(2) imposes a criminal penalty on any person who:

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct

such a financial transaction which in fact involves
the proceeds of specified unlawful activity –
. . .
   (B)   knowing that the transaction is designed in
   whole or in part –

      (i)   to conceal or disguise the nature, the
      location, the source, the
         ownership, or the control of the
      proceeds of specified unlawful
         activity[.]

150.   Pursuant to 18 U.S.C. § 1956(c)(7), "specified
unlawful activity" is defined to include any felony violation of
the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd-1
*et seq.*

151.   As set forth above, the Defendant Properties are the
subject of, or traceable to, financial transactions or attempted
financial transactions and, for the reasons set forth above, the
funds involved in those transactions were derived from specified
unlawful activity, that is, violations of the Foreign Corrupt
Practices Act.

152.   Also, as set forth above, the transactions were
designed in whole or in part to conceal or disguise the source,
ownership, or control of the proceeds of specified unlawful
activity.

153.   As such, the Defendant Properties are subject to
forfeiture to the United States pursuant to 18 U.S.C. §
981(a)(1)(A), on the grounds that they were involved in
transactions or attempted transactions in violation of 18 U.S.C.

§ 1956(a)(1)(B)(i), or are traceable to such property.

## FOURTH CLAIM FOR FORFEITURE

154. The United States incorporates by reference paragraphs 1 through 135 above as if fully set forth herein.

155. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956], or any property traceable to such property," is subject to forfeiture to the United States.

156. 18 U.S.C. § 1956(a)(2) imposes a criminal penalty on any person who:

> transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
>
> . . .
>
> > (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—
> >
> > > (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

157. Pursuant to 18 U.S.C. § 1956(c)(7), "specified unlawful activity" is defined to include any felony violation of the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd-1

*et seq.*

158. As set forth above, the Defendant Properties were involved in the transportation, transmission, or transfer of funds, or attempted transportation, transmission, or transfer of funds, affecting interstate or foreign commerce, to a place in the United States from or through a place outside the United States, with proceeds of some form of unlawful activity, that is, violations of the Foreign Corrupt Practices Act.

159. As further set forth above, such transfers or attempted transfers were conducted with the knowledge that the property involved represented the proceeds of some form of unlawful activity, and knowing that such transfers or attempted transfers were designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.

160. Accordingly, the Defendant Properties are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A) on the grounds that they constitute property involved in transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(2)(B)(i), or are traceable to such property.

## FIFTH CLAIM FOR FORFEITURE

161. The United States incorporates by reference paragraphs 1 through 135 above as if fully set forth herein.

162. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956], or any property traceable to such property," is subject to forfeiture to the United States.

163. Title 18, U.S.C. § 1956(h) imposes a criminal penalty on any person who "conspires to commit any offense defined in [18 U.S.C. §§ 1956 or 1957]."

164. As set forth above, the Defendant Properties were involved in a conspiracy to conduct, or attempt to conduct, transactions in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), (a)(2)(B)(i), and/or 1957, affecting foreign commerce, that involved the proceeds of specified unlawful activity, that is, violations of the Foreign Corrupt Practices Act.

165. Accordingly, the Defendant Properties are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A) on the grounds that they constitute property involved in transactions or attempted transactions in violation of 18 U.S.C. § 1956(h), or are traceable to such property.

## CLAIM FOR RELIEF

**WHEREFORE** Plaintiff, the United States, requests as follows:

(1)  Enter judgment against the Defendant Properties, and in favor of the United States, on all claims alleged in the Complaint.

(2)  Issue process to enforce the forfeiture of the Defendant Properties, requiring all persons having an interest in the Defendant Properties be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant Properties to the United States of America for disposition according to law; and

(3)  That the United States be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated:   February 17, 2016.

Respectfully submitted,

M. KENDALL DAY, CHIEF
ASSET FORFEITURE AND MONEY
     LAUNDERING SECTION

By:   _Marie Dalt_____
       MARIE M. DALTON
       Trial Attorney
       Asset Forfeiture and Money
            Laundering Section
       United States Department of Justice
       1400 New York Avenue, NW
       Bond Building, Suite 10100

```
Washington, DC  20005
Telephone:        (202) 598-2982
Email:            Marie.Dalton@usdoj.gov
```

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## VERIFICATION

I, Jeffrey LaMirand, a Special Agent with Internal Revenue Service, Criminal Investigation ("IRS-CI"), hereby verify and declare under penalty of perjury that I have read the foregoing Verified Complaint *In Rem* and know the contents thereof, and that the factual statements contained in the Verified Complaint are true to my own knowledge, except those factual statements herein stated to be alleged on information and belief and as to those factual statements I believe them to be true. In signing this verification I am not opining on any legal theories or conclusions contained herein.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent of IRS-CI. This Verified Complaint does not set forth each and every fact learned during the course of this investigation or known to the United States but rather only contains those factual statements necessary to establish, by a preponderance of the evidence, that the Defendant Properties are subject to forfeiture. The dates and amounts referred to in this Verified Complaint are approximate. The names referenced may have alternate spellings in original and translated documents.

I hereby verify and declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on this ‖ day of February 2016.

_Jeffrey Lamirand_
JEFFREY LAMIRAND
SPECIAL AGENT
INTERNAL REVENUE SERVICE
CRIMINAL INVESTIGATION

District of Columbia: SS

Subscribed and sworn to before me, in my presence
this _11th_ day of _February_, _2016_

_R. Taylor_
Notary Public, DC

My commission expires _11/30/2016_

RASHIA A. TAYLOR
NOTARY PUBLIC DISTRICT OF COLUMBIA

**ATTACHMENT A**

**STATUTORY AUTHORITY**

### A. Foreign Corrupt Practices Act

1.   The anti-bribery provisions of the Foreign Corrupt Practices Act ("FCPA"), codified at 15 U.S.C. § 78dd-1, *et seq.*, among other things, make it unlawful for any "issuer," or for any officer, director, employee, or agent of such issuer, to knowingly make use of any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to any "foreign official" for purpose of securing any improper advantage or of inducing such foreign official to use his or her influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality, in order to assist such issuer in obtaining or retaining business for or with, or directing business to, any person.   15 U.S.C. § 78dd-1(a) and (g).

2.   A company is an "issuer" under the FCPA if it has a class of securities registered under Section 12 of the Exchange Act or is required to file periodic and other reports with the U.S. Securities and Exchange Commission ("SEC") under Section 15(d) of the Exchange Act.   15 U.S.C. § 78dd-1.   In practice,

this means that any company with a class of securities listed on a national securities exchange in the United States, or any company with a class of securities quoted in the over-the-counter market in the United States and required to file periodic reports with the SEC, is an issuer. A company thus need not be a U.S. company to be an issuer. Foreign companies with American Depository Receipts that are listed on a U.S. exchange are also issuers.

3.   The definition of a "foreign official" under the FCPA includes any officer or employee of a foreign government or any department, agency or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such government or department, agency, or instrumentality, or for or on behalf of any such public international organization. 15 U.S.C. § 78dd-1(f).

4.   Under the FCPA, the improper advantage or influence sought does not have to be within the scope of the foreign official's official duties.  15 U.S.C. § 78dd-1(a) and (g).

## B.  Money Laundering

5.   Among other acts, 18 U.S.C. § 1956 prohibits the transportation, transmission, or transfer, or the attempt to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or

2

through a place outside the United States (a) with the intent to promote the carrying on of specified unlawful activity; or (b), knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is "designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(2).

6.    Additionally, 18 U.S.C. § 1957 prohibits the conducting of a monetary transaction with property valued at greater than $10,000 that is known to be criminally derived and which constitutes the proceeds of "specified unlawful activity."

7.    For purposes of Sections 1956 and 1957, a violation of the FCPA constitutes a "specified unlawful activity" as defined by 18 U.S.C. § 1956(c)(7)(D).

8.    The term financial transaction, as defined in 18 U.S.C. § 1956(c)(4), includes (a) a transaction that affects interstate or foreign commerce involving the movement of funds by wire or other means and (b) a transaction involving the use of a financial institution that is engaged in, or the activities of which affect, interstate or foreign commerce.

9.    Section 1956 further states: "Any person who conspires to commit any offense defined in this section . . .  shall be subject to the same penalties as those prescribed for the offense of the commission of which was the object of the conspiracy."   18 U.S.C. § 1956(h).

**ATTACHMENT B**

| Account Name | Bank/Country | Account Number |
|---|---|---|
| SWISDORN's Aizkraukles Account | Aizkraukles Bank, Latvia[1] | XXXXXXXXXXX0301 |
| SWISDORN's Parex Account | Parex Bank, Latvia[2] | XXXXXX0001 |
| SWISDORN's Standard Chartered Account | Standard Chartered Bank, Hong Kong | XXXXXXX6041 |
| TAKILANT's Lombard Odier Account | Lombard Odier, Switzerland | CH1408760000050335300 |
| TAKILANT's Aizkraukles Account | Aizkraukles Bank, Latvia | XXXXXX6531 |
| TAKILANT's Parex Account | Parex Bank, Latvia | XXXXXX0001 |
| TAKILANT's Standard Chartered Accounts | Standard Chartered, Hong Kong | XXXXXXX8808 XXXXXXX8883 |
| TOZIAN's Lombard Odier Account | Lombard Odier, Switzerland | CH3408760000050982900 |
| TOZIAN's UBP Account | Union Bancaire Privee, Switzerland | CH2308657007007159821 |

---

[1] In 2011, Aizkraukles became ABLV Bank. Thus, in 2011, accounts held by SWISDORN, TAKILANT, and others held at Aizkraukles transferred to ABLV Bank. For ease of reference, I will use the term Aizkraukles to refer to both Aizkraukles and ABLV Bank.

[2] In 2010, Parex was reorganized and a portion of its assets were assumed by newly formed Citadele Bank. Thus, in 2010, accounts held by SWISDORN, TAKILANT, and others held at Parex transferred to Citadele Bank. For ease of reference, I will use the term Parex to refer to both Parex and Citadele Bank.